UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLYN COOPER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TRIWEST HEALTHCARE ALLIANCE CORP., <br><br> Defendant. | Case No. 11-cv-2965-L(RBB) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS WITH LEAVE TO AMEND [DOC. 22]** |

    This action arises from Plaintiffs Carolyn Cooper and Jason Cooper's allegations that the failure of Defendant TriWest Healthcare Alliance Corp. ("TriWest") to provide 24-hour nursing care for their daughter, S.C., resulted in their child's death.  Defendant now moves to dismiss the claims in the First Amended Complaint ("FAC") under Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs oppose.

    The Court found this motion suitable for determination on the papers submitted and without oral argument.  *See* Civ. L.R. 7.1(d.1).  (Doc. 26.)  For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to dismiss.

//

## I. BACKGROUND

Mr. Cooper is a Master Sergeant in the United States Marine Corps, and Mrs. Cooper was employed as a Financial Controller for WJ Commercial Enterprises. (FAC ¶¶ 1–2.) They are S.C.'s parents. (*Id.* ¶¶ 1–2, 10.) Plaintiffs allege that TriWest was a contractor covering the West region and it was "responsible for administering the TRICARE program for more than 2.9 million beneficiaries in the 21-state TRICARE West Region." (*Id.* ¶ 17.) "TRICARE, formerly known as the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), is a healthcare program of the United States Department of Defense Military Health System," and "[t]he TRICARE Management Activity ("TMA") is a government entity that manages and administers the TRICARE program." (*Id.* ¶¶ 11-12.)

In September 2008, S.C. was born to Plaintiffs. (*Id.* ¶ 25.) At the time of birth, Plaintiffs allege that S.C. was a healthy female child. (*Id.*)

However, on March 28, 2009, S.C. was diagnosed with severe global cerebral atrophy, a disease affecting the brain. (FAC ¶ 26.) The cause of the disease was unknown. (*Id.*) Symptoms included seizures, hypertonic muscle tone, microcephaly, the inability to stand without multiple points of support and restraint, and the inability to hold her head up. (*Id.* ¶ 27.) S.C.'s medical condition allegedly required a complex medication regimen with a need for skilled supervision to prevent possible interaction and side effects. (*Id.* ¶ 28.)

On June 19, 2009, Maxim Home Health Care performed an "in home" evaluation of S.C. and concluded that her condition required "Skilled Nursing Supervision." (FAC ¶ 31.) Maxim Home Health Care then requested Skilled Nursing services from Defendant. (*Id.* ¶ 32.) On June 29, 2009, Defendant denied the request. (*Id.* ¶ 34.)

Following the denial, Plaintiffs turned to Medi-Cal, which approved Skilled Nursing supervision for 40 hours per week. (FAC ¶ 37.) Plaintiffs used the 40 hours during their work week but allege that they were forced to care for S.C. during their "off work" hours. (*Id.*) Caring for S.C. during that time period required Plaintiffs to remain awake during the nights to make sure that she did not aspirate and choke. (*Id.* ¶ 39.) However, "there were many nights that Plaintiffs were unable to stay awake and had to make the decision to sleep hoping that S.C.

did not choke while they were sleeping." (*Id.*)  Plaintiffs also took turns staying up as much as possible to make sure that S.C. was properly monitored.  (*Id.* ¶ 40.)  During the same time, Mrs. Cooper was also pregnant with her second child.  (*Id.* ¶ 38.)

On July 28, 2009, Plaintiffs requested that Defendant reconsider its June 29, 2009 decision to deny Skilled Nursing Services.  (FAC ¶ 41.)  Dr. Kris Baik of the Naval Medical Center in Camp Pendleton supported Plaintiffs' request for reconsideration by submitting a formal request to Defendant for nursing services "based on her belief that S.C. qualified to receive the requested benefit." (*Id.*)  Plaintiffs allege that around that time, S.C.'s condition had deteriorated further with seizures that were new and poorly controlled.  (*Id.*)  Records from the Naval Medical Center Balboa were also added to the reconsideration request "showing S.C.'s first confirmed seizure[,] which lasted about an hour." (*Id*. ¶ 42)  Moreover, another doctor, Dr. J. Serena, also provided her notes concerning S.C.'s neurological condition to further support the reconsideration request.  (*Id.* ¶ 20.)  Those notes addressed "increasing issues with spasticity and irritability and the need for the administration of medications such as diazepam." (*Id.* ¶ 43.)  Maxim Home Health Care also prepared and updated their evaluation of S.C.'s condition to support the reconsideration request "based on [S.C.'s] evolving medical condition and reached the same conclusion it had reached before[,] that skilled nursing supervision was required." (*Id.*)  On August 26, 2009, Defendant denied the reconsideration request.  (*Id.* ¶ 45.)

Thereafter, Plaintiffs concentrated their efforts on keeping S.C. healthy.  (FAC ¶ 49.)  They were told that "if S.C.'s needs were properly addressed by proper skilled nursing supervision, she would likely live at least 10 to 15 years and could live much longer." (*Id.* ¶ 49.)  Plaintiffs do not allege the source of that information.  According to Plaintiffs, aspiration pneumonias were the greatest threat to S.C.'s health.  (*Id.* ¶ 50.)  S.C. also had many daily needs that Plaintiffs were allegedly unable to provide themselves.  (*Id.*)  As a result, Plaintiffs allege that they suffered sleep deprivation.  (*Id.*)

//
//
//

On September 1, 2009, S.C. suffered her first documented aspiration pneumonia. (FAC ¶ 51.) She was treated with antibiotics at Camp Pendleton Naval Hospital and recovered. (*Id.*) But Plaintiffs allege that they were "specifically told that it was greatly important that they watch S.C.'s condition during the nights so that if any vomiting occurs, it [could] be cleaned up to prevent any possible pneumonia." (*Id.*)

On February 8, 2010, S.C. experienced a second aspiration during the night which led to another pneumonia. (FAC ¶ 52.) These episodes recurred on March 31, June 1, and June 17 in 2010. (*Id.*) Each time she was treated at Camp Pendleton. (*Id.*) Plaintiffs allege that, with each passing episode, S.C. became weaker, more prone to pneumonia, and more resistant to antibiotics. (*Id.* ¶ 53.)

On July 19, 2010, Dr. Matthew Piccone of Camp Pendleton Pediatrics submitted an electronic request for services to Defendant. (FAC ¶ 54.) The request was denied on the same day. (*Id.*) Thereafter, Plaintiffs submitted a request to Defendant for redetermination of the denial of Dr. Piccone's request. (*Id.* ¶ 56.) Once again, the request was denied. (*Id.*)

On November 12, 2010, Dr. Mower, a neurologist, submitted a new request to Defendant, which included more "in depth" analysis of S.C.'s condition and a letter from Dr. Piccone. (FAC ¶ 57.) The request was denied. (*Id.* ¶ 59) On January 6, 2011, Plaintiffs submitted another request for reconsideration of Defendant's denial of Dr. Mower's request. (*Id.* ¶ 59.) Again, the request was denied. (*Id.*)

Finally, Plaintiffs submitted a final appeal to the TMA in Colorado. (FAC ¶ 60.) That appeal remained undecided until it became moot by S.C.'s death. (*Id.*)

S.C. suffered additional episodes of aspiration pneumonia in 2011 on March 22 and July 16. (FAC ¶ 62.) On July 28, 2011, she suffered an aspiration burn and woke up to a 103-degree fever. (*Id.*)

On August 9, 2011, S.C. passed away. (FAC ¶ 34.)

On December 20, 2011, Plaintiffs filed a complaint asserting six causes of action. Thereafter, Defendant moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Eventually, the Court granted Defendant's motion with leave to

amend.

On October 19, 2012, Plaintiffs filed the FAC asserting the following six causes of action: (1) wrongful death / tortious interference with contractual relations, (2) wrongful death / negligence, (3) negligent infliction of emotional distress ("NIED"), (4) intentional infliction of emotional distress ("IIED"), (5) survival action for tortious interference with contractual relations, and (6) survival action for negligence. (Doc. 18.) Defendant files this motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 22.) Plaintiffs oppose. (Doc. 24.)

## II.  LEGAL STANDARD

The court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court must accept all allegations of material fact as true and construe them in light most favorable to the nonmoving party. *Cedars-Sanai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). Material allegations, even if doubtful in fact, are assumed to be true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, the court need not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotation marks omitted). In fact, the court does not need to accept any legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). Instead, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S.

at 678 (citing *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

### III.   DISCUSSION

#### A.   Federal Law Does Not Preempt Plaintiffs' Common Law Claims.

Preemption analysis begins with the presumption that Congress does not intend to supplant state law.  *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995).  Whether a federal law supersedes federal law turns on Congress' intent; federal law preempts state law in areas of historic police power only if so doing is the clear and manifest purpose of Congress.  *Id.* at 655; *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 426 (2002).  When appearing in an express preemption clause, the words "relate to" cannot be interpreted as extending without limit, but must be framed according to the objectives of the statute.  *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 813-14 (1997).  Use of the word "a" before the phrase "law or regulation" in a preemption clause suggests that Congress does not intend to preempt state common-law claims.  *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 62-63 (2002).  The party arguing for federal preemption must bear the "considerable burden" of overcoming the presumption that the statute in question does not supersede state law.  *See De Buono*, 520 U.S. at 814.  In order to relate to an object for the purpose of express preemption, a state law or regulation must have more than "an indirect, remote, or tenuous effect" on that object.  *See Tillison v. Gregoire*, 424 F.3d 1093, 1099 (9th Cir. 2005).

//

//

The plain wording of a statute is the starting point in statutory construction, as it contains the best evidence of Congress' intent as to preemption. *Sprietsma*, 537 U.S. at 62-63. The statute authorizing TRICARE regulations states, in relevant part:

> (a) Occurrence of preemption.--A law or regulation of a State or local government relating to health insurance, prepaid health plans, or other health care delivery or financing methods shall not apply to any contract entered into pursuant to this chapter by the Secretary of Defense or the administering Secretaries to the extent that the Secretary of Defense or the administering Secretaries determine that--
>
> (1) the State or local law or regulation is inconsistent with a specific provision of the contract or a regulation promulgated by the Secretary of Defense or the administering Secretaries pursuant to this chapter; or
>
> (2) the preemption of the State or local law or regulation is necessary to implement or administer the provisions of the contract or to achieve any other important Federal interest.

10 U.S.C. § 1103. The TRICARE regulations state, in relevant part:

> (i) Pursuant to 10 U.S.C. 1103 and section 8025 (fourth proviso) of the Department of Defense Appropriations Act, 1994, the Department of Defense has determined that in the administration of 10 U.S.C. chapter 55, preemption of State and local laws relating to health insurance, prepaid health plans, or other health care delivery or financing methods is necessary to achieve important Federal interests, including but not limited to the assurance of uniform national health programs for military families and the operation of such programs at the lowest possible cost to the Department of Defense, that have a direct and substantial effect on the conduct of military affairs and national security policy of the United States.
>
> (ii) Based on the determination set forth in paragraph (a)(7)(i) of this section, any State or local law relating to health insurance, prepaid health plans, or other health care delivery or financing methods is preempted and does not apply in connection with TRICARE regional contracts. Any such law, or regulation pursuant to such law, is without any force or effect, and State or local governments have no legal authority to enforce them in relation to the TRICARE regional contracts. (However, the Department of Defense may by contract establish legal obligations of the part of TRICARE contractors to conform with requirements similar or identical to requirements of State or local laws or regulations).

32 C.F.R. § 199.17(a)(7). Both the authorizing statute and TRICARE regulations frame state and local laws to be preempted through their relation to health insurance, prepaid health plans, or other health care delivery or financing methods. 10 U.S.C. § 1103; 32 C.F.R. § 199.17(a)(7). The regulations clarify the Congressional purpose by emphasizing the federal interests associated with uniformity and lowering costs for military families' healthcare. *Id.*

Defendant argues in its motion that Plaintiffs' common-law claims relate to the administration of TRICARE and that, as a result, TRICARE regulations preempt them. (Def.'s Mot. 10:18-19.)  Defendant does not argue that the common law of general applicability underlying Plaintiffs' claims relates to the delivery of healthcare under TRICARE regulations or their authorizing statute.  Instead, it prompts the Court to endorse the proposition that Plaintiffs' common-law claims themselves relate to health care delivery within the meaning of TRICARE regulations and its authorizing statute.  This premise runs counter to preemption jurisprudence in three ways.

First, the Supreme Court in *Sprietsma* reasoned that use of the indefinite article "a" before the phrase "law or regulation" in a preemption clause implies a "discreteness" that the Congressional intent is to only preempt definite and positive enactments, not common-law causes of action.  537 U.S. at 63.  The statute authorizing TRICARE regulations uses the very same phrase, "a law or regulation of a State or local government."  10 U.S.C. § 1103.  Like the *Sprietsma* plaintiff's claims, Plaintiffs' causes of action here are based in the common law of general applicability falling squarely within states' historical police powers.  537 U.S. at 55-56.  The Federal Boat Safety Act ("FBSA"), which the court analyzed in *Sprietsma*, had a savings clause expressly preventing common-law preemption, but this clause merely "buttressed" the court's conclusion.  *Id.* at 62-63.  While TRICARE regulations contain no analogous savings clause, the plain wording of the authorizing statute compels the same conclusion that the Supreme Court reached in *Sprietsma*—only laws of a definite, positive character are preempted.  *Id*. at 63; 10 U.S.C. § 1103.

Defendant argues in its reply that use of the word "any" in TRICARE regulations negates the "discreteness," which the *Sprietsma* court found implied in the FBSA's wording.  (Def.'s Reply 4:4-5.)  But to analyze regulations as eliminating the "discreteness" present in their authorizing statute would run contrary to the nature of federal delegation because "[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law.  Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.'"  *Ernst & Ernst v. Hochfelder*, 425

U.S. 185, 213-14 (quoting *Dixon v. United States*, 381 U.S. 68, 74 (1965)).  Therefore, the will of Congress as expressed by the authorizing statute must control preemption analysis.  10 U.S.C. § 1103.

Second, Defendant's assertion that common-law claims relate to healthcare delivery within the meaning of TRICARE regulation stretches the meaning of the phrase "related to" in a manner inconsistent with the Supreme Court's reasoning in *Travelers*.  514 U.S. at 655-61.  In *Travelers*, the court focused on regulatory objectives, which centered on federal interests in the uniformity and reduction of the financial burden associated with complying with varying laws from state to state.  514 U.S. at 656-57.  The two objectives made explicit within the TRICARE regulations are likewise uniformity and cost reduction.  32 C.F.R. § 199.17(a)(7)(I) ("[P]reemption . . . is necessary to achieve important Federal interests, including but not limited to the assurance of uniform national health programs for military families and the operation of such programs at the lowest possible cost to the Department of Defense[.]").  Declaring TRICARE administrators to be immune from state police power might indirectly lower the price of healthcare administration, but this connection with pricing is tenuous at best.  *See Tillison*, 424 F.3d at 1099.

Third, Defendant provides insufficient support to overcome the starting presumption that Congress did not intend to preempt such claims.  *See Travelers*, 514 U.S. at 654.  If taken to its logical conclusion, Defendant's argument would result in TRICARE regulations preempting any state law of general applicability so long as enforcement of such law in certain circumstances is connected to healthcare or its delivery.  TRICARE administrators would be effectively immune from state police power.  There is nothing in the text of the statute or the regulations it authorizes that indicates a clear and manifest purpose on the part of Congress or the Department of Defense to take such a drastic step.  *See Ours Garage*, 536 U.S. at 426.

Further, Defendant fails to overcome its burden of showing this intent on the part of Congress.  It relies heavily on *Bynum v. Aetna Government Health Plan*, 907 F. Supp. 320 (S.D. Cal. 1995), which was decided before the recent developments in preemption law in *Sprietsma* and *Tillison*.  *Sprietsma* and *Tillison* have reshaped preemption analysis as to common-law

claims, and as a result, Defendant's reliance is unavailing. *See Sprietsma*, 537 U.S. at 63 (declining to extend express federal preemption under an equivalently-worded preemption clause to cover common-law claims); *Tillison*, 424 F.3d at 1099 (applying a definition of the phrase "related to" which excludes indirect, remote, or tenuous relationships). Because of Defendant's failure to overcome its burden, the presumption that Congress did not intend to supplant such state-law claims controls. *See Travelers*, 514 U.S. 654-55.

In sum, neither the TRICARE regulations nor the statute authorizing them preempts Plaintiffs' common-law causes of action. *See* 10 U.S.C. § 1103; 32 C.F.R. § 199.17(a)(7)(i). Because Defendant does not move to dismiss on any other grounds, Plaintiffs' second cause of action survives Defendant's motion. *See* Fed. R. Civ. P. 12(b)(6).

**B.     Plaintiffs Fail to Allege a Contractual Relationship with Defendant.**

Plaintiffs' first and fifth causes of action are based on a theory of tortious interference with contract. (FAC ¶¶ 66-78, 108-122.) The elements for a cause of action for intentional interference with contractual relations are: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) intentional acts on the part of a defendant designed to induce a breach or disruption of the contractual relationship; (4) breach or disruption of the contractual relationship; and (5) resulting damage. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

Plaintiffs allege that "by virtue of being TRICARE beneficiaries . . . a contractual relationship existed" between them and both the TMA and "the TRICARE system as a whole." (FAC ¶¶ 67-68, 110-111.) But they fail to allege any facts to show that a contract existed beyond their status as beneficiaries of TRICARE. Moreover, the existence of a contract is a question of law. *See Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 530 (9th Cir. 2003) (citing *Helash v. Ballard,* 638 F.2d 74, 75 (9th Cir.1980)). Because the existence of a contract is a question of law, the cryptic allegation that a "contractual relationship existed" between Plaintiffs and TMA and between Plaintiffs and the TRICARE system through Plaintiffs' beneficiary status is a legal conclusion and will not be assumed as true for the

purposes of a motion to dismiss under Rule 12(b)(6).  *See Iqbal*, 556 U.S. at 678.

Without adequately alleging the existence of a contractual relationship between Plaintiffs and TMA or the TRICARE system, Plaintiffs' causes of action for interference with contractual relations do not state a claim for which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).

### C.    Defendants Fail to Show Plaintiffs' Cause of Action for NIED Is Defective.

Defendant argues that Plaintiffs' third cause of action asserting NIED is legally insufficient because it duplicates their second cause of action, which asserts negligence in the context of wrongful death.  (Def.'s Mot. 18:8-12.)  In support of this proposition, Defendant cites *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 984 (1993), in which the California Supreme Court endorsed the proposition that "there is no independent tort of negligent infliction of emotional distress" in the context of outlining the elements of a NIED prima facie case.  *Id*. at 984.  *Potter* provides no support for the assertion that NIED duplicates a separate cause of action of negligence for wrongful death.  *See id*.  Consequently, Defendant's contentions are simply not supported by law it cites.  Therefore, this cause of action survives Defendant's motion.  *See Twombly*, 550 U.S. at 555.

### D.    Plaintiffs Fail to Plead Extreme and Outrageous Conduct by Defendant.

There are three elements of the prima facie case for an IIED cause of action: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate causation of the emotional distress by the defendant's outrageous conduct."  *Cervantez v. J.C. Penney Co.*, 24 Cal. 3d 579, 593 (1979), *superseded by statute on other grounds as stated in Melendez v. City of Los Angeles*, 63 Cal. App. 4th 1, 7 (1998).  The defendant's extreme and outrageous conduct must "exceed all bounds of that usually tolerated in a civilized community."  *McDaniel v. Gile*, 230 Cal. App. 3d 363, 372 (1991).  Such conduct may arise by abuse of position or relation with the plaintiff in circumstances that give the defendant apparent or actual authority over the plaintiff.  *Id.*  Mere

denial or delay of insurance benefits does not constitute outrageous conduct for the purpose of IIED, but such denial can be outrageous if, in protecting its economic interests, an insurer fails to assert its legal rights with a good-faith belief of their existence. *See Mintz v. Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1608 (2009); *Hailey*, 158 Cal. App. 4th at 475-76. Because Defendant only challenges the first element of Plaintiffs' IIED cause of action, the Court will also address only this element below. (Def.'s Mot. 16:14-18.)

Plaintiffs allege that, as a TRICARE administrator, Defendant was entrusted with the duty to make factual determinations with respect to requests for medical coverage by TRICARE beneficiaries. (FAC ¶ 100.) They further allege that "a financial incentive existed for TriWest to maximize the denial of healthcare coverage to TRICARE beneficiaries in an effort to make their contract with TMA more profitable," that Defendant failed "to carefully study clear medical evidence presented to TriWest through multiple requests submitted by medical doctors and other healthcare providers," and that Defendant "totally [ignored] the plight of the Plaintiffs and their daughter for nearly two years." (FAC ¶¶ 103-04.) Assuming the factual allegations are true, Plaintiffs nonetheless fail to plead a sufficient factual basis to raise their IIED cause of action above a speculative level. *See Twombly*, 550 U.S. at 555.

As Defendant notes in its motion, denial of benefits for an insurance claim, without more, is insufficient to establish outrageous conduct under California law. (Def.'s Mot. 17:8-10.) In adjudicating Plaintiffs' TRICARE requests, Defendant asserted a legal right entrusted to it by contract, just as would an insurer in a similar circumstance. (FAC ¶ 103.) The FAC is not specific as to whether Defendant allegedly did more than assert its right to adjudicate Plaintiffs' TRICARE request. Plaintiffs contend that Defendant failed to carefully study the medical evidence presented to it and ignored the plight of their daughter. (FAC ¶ 104.) But the meaning of this language is unclear. Failing to carefully study medical evidence and ignoring the plight of Plaintiffs' daughter does not necessarily suggest bad faith or abuse of power. (FAC ¶¶ 99- 104.) Plaintiffs allege that Defendant had a financial incentive to deny coverage to beneficiaries, but they do not allege that this financial incentive caused Defendant to abuse its authority to accurately adjudicate claims. (FAC ¶ 103.) Without bad faith or abuse of authority on the part

of Defendant, Plaintiffs' contentions of outrageous conduct rest solely on the denial of a benefit and are analogous to those of *Mintz*. *See Mintz*, 172 Cal. App. 4th at 1609; *McDaniel*, 230 Cal. App. 3d at 372; *Hailey*, 158 Cal. App. 4th at 476.

In sum, Plaintiffs' factual allegations are not specific enough to raise their IIED cause of action above a speculative level. *See Twombly*, 550 U.S. at 555. As a result, Plaintiffs' fourth cause of action does not state a claim for which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

### E.  Plaintiffs Fail to Plead Damages with Sufficient Specificity.

Plaintiffs allege in their sixth cause of action, a survival damage for negligence, that "[a]s a direct and proximate result of TriWest's breach of duty of care, S.C. suffered damages including the loss of her life, loss of her family's love and affection, companionship, support, and all other benefits associated with having a supportive family." (FAC ¶ 135.) However, the damages Plaintiffs allege in conjunction with this cause of action are ambiguous.

Defendant argues that Plaintiffs seek "hedonic" damages to compensate them for the loss of their daughter's enjoyment of life, while Plaintiffs insist that they seek personal-injury and prospective earnings only. (*See* Def.'s Mot. 15:19-22; Pl.'s Reply 15:3-20.) The Court may not speculate as to the meaning of Plaintiffs' ambiguous pleading. *See Twombly*, 550 U.S. at 555. Because of a lack of definiteness with respect to damages, Plaintiffs' sixth cause of action fails to state a claim rising above the speculative level as required under *Twombly*. *See id*. Therefore, Plaintiffs' sixth cause of action does not state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

### IV.  CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to dismiss. (Doc. 22.) Specifically, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' first, fourth, fifth, and sixth causes of action. Furthermore, the Court **GRANTS** Plaintiffs leave to amend only the aforementioned causes of action that have been

1  dismissed.  If Plaintiffs decide to file an amended complaint, they must do so by **June 24, 2013**.

2  **IT IS SO ORDERED.**

4  DATED: June 13, 2013

_____
M. James Lorenz
United States District Court Judge

7  COPY TO:

8  HON. RUBEN B. BROOKS
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL