1
2
3
4
5
6
7
8
9
10          UNITED STATES DISTRICT COURT

11          SOUTHERN DISTRICT OF CALIFORNIA

12

13  CAROLYN COOPER, *et al.*,          )   Case No. 11-cv-2965-L(RBB)
                                       )
14                  Plaintiffs,        )   **ORDER GRANTING**
                                       )   **DEFENDANT'S MOTION TO**
15  v.                                 )   **DISMISS WITHOUT LEAVE TO**
                                       )   **AMEND [DOC. 29]**
16  TRIWEST HEALTHCARE                 )
    ALLIANCE CORP.,                    )
17                                     )
                    Defendant.         )
18                                     )
                                       )
19                                     )
                                       )
20  ───────────────────────────────
         This action arises from Plaintiffs Carolyn Cooper and Jason Cooper's allegations that the

21  failure of Defendant TriWest Healthcare Alliance Corp. ("TriWest") to provide 24-hour nursing

22  care for their daughter, S.C., resulted in her death.  On June 24, 2013, after receiving leave from

23  the Court, Plaintiffs filed their Second Amended Complaint ("SAC").  Defendant now moves to

24  dismiss Plaintiffs' first, fourth, fifth, and sixth causes of action under Federal Rule of Civil

25  Procedure 12(b)(6).  Plaintiffs oppose.

26       The Court found this motion suitable for determination on the papers submitted and

27  without oral argument.  *See* Civ. L.R. 7.1(d.1).  (Doc. 32.)  For the following reasons, the Court

28  **GRANTS WITHOUT LEAVE TO AMEND** Defendant's motion to dismiss.

## I.    BACKGROUND

Plaintiffs are the parents of S.C., who is now deceased.  (SAC ¶¶ 1–2.)  Because Mr. Cooper is a Master Sergeant in the United States Marine Corps, he and his family are eligible to receive healthcare benefits through TRICARE, a healthcare program of the United States Department of Defense Military Health System.  (*Id.* ¶¶ 1, 10–11.)

Plaintiffs describe the TRICARE Management Activity ("TMA") as "a government entity that manages and administers the TRICARE program."  (SAC ¶ 12.)  They allege that "as part of its management responsibilities, the TMA selects and contracts with Managed Care Support contractors (hereinafter referred to as 'MCS contractors'), for the purpose of administering and providing healthcare services to TRICARE beneficiaries."  (*Id.* ¶ 13.)  "[A]s the MCS contractor for the West region, TriWest was responsible for administering the TRICARE program."  (*Id.* ¶ 17.)  According to Plaintiffs, Defendant's responsibilities also included "making the initial factual determination as to whether a TRICARE beneficiary's request for medical coverage could be approved or rejected under the applicable TRICARE guidelines," and "accept[ing] and decid[ing] TRICARE beneficiaries' requests for Reconsideration in the West Region."  (*Id.* ¶¶ 18–19.)

On September 18, 2008, S.C. was born to Plaintiffs.  (*SAC* ¶ 25.)  Plaintiffs allege that S.C. was a healthy female child at the time of birth.  (*Id.*)

However, on March 28, 2009, S.C. was diagnosed with severe global cerebral atrophy, a disease affecting the brain.  (SAC ¶ 26.)  The cause of the disease was unknown.  (*Id.*)  Symptoms included seizures, hypertonic muscle tone, microcephaly, the inability to stand without multiple points of support and restraint, and the inability to hold her head up.  (*Id.* ¶ 27.)  S.C.'s medical condition allegedly "required a complex medication regimen with a need for skilled supervision to prevent possible interaction and side effects."  (*Id.* ¶ 28.)

On June 19, 2009, Maxim Home Health Care, a TRICARE Network healthcare provider, concluded S.C.'s condition required "Skilled Nursing Supervision" after performing an "in home" evaluation.  (SAC ¶ 31.)  Maxim Home Health Care then requested Skilled Nursing services from Defendant.  (*Id.* ¶ 32.)  On June 29, 2009, Defendant denied the request.  (*Id.* ¶

11cv2965

34.)

Following the denial, Plaintiffs turned to Medi-Cal, which approved Skilled Nursing supervision for S.C. totaling 40 hours per week.  (SAC ¶ 37.)  Plaintiffs used the 40 hours while at work, but allege that they were forced to care for S.C. during their "off work" hours.  (*Id.*)  Caring for S.C. during off-work hours required Plaintiffs to remain awake during the nights to make sure she did not aspirate and choke.  (*Id.* ¶ 39.)  However, "there were many nights that Plaintiffs were unable to stay awake and had to make the decision to sleep hoping that S.C. did not choke while they were sleeping."  (*Id.*)  Plaintiffs also took turns staying up as much as possible to make sure that S.C. was properly monitored.  (*Id.* ¶ 40.)  During the same time, Mrs. Cooper became pregnant with her second child.  (*Id.* ¶ 38.)

On July 28, 2009, Plaintiffs requested that Defendant reconsider its June 29, 2009 decision to deny Skilled Nursing Services.  (SAC ¶ 41.)  Dr. Kris Baik of the Naval Medical Center in Camp Pendleton supported Plaintiffs' request for reconsideration by submitting a formal request to Defendant for nursing services "based on her belief that S.C. qualified to receive the requested benefit."  (*Id.*)  Plaintiffs allege that around that time, S.C.'s condition had deteriorated further with seizures that were new and poorly controlled.  (*Id.*)  Records from the Naval Medical Center Balboa were also added to the reconsideration request "showing S.C.'s first confirmed seizure[,] which lasted about an hour."  (*Id.* ¶ 42.)  Moreover, Dr. J. Serena also provided her notes concerning S.C.'s neurological condition to further support the reconsideration request.  (*Id.* ¶ 43.)  Those notes addressed "increasing issues with spasticity and irritability and the need for the administration of medications such as diazepam."  (*Id.* ¶ 43.)  Maxim Home Health Care also prepared and updated their evaluation of S.C.'s condition to support the reconsideration request "based on [S.C.'s] evolving medical condition and reached the same conclusion it had reached before[,] that skilled nursing supervision was required."  (*Id.*)  On August 26, 2009, Defendant denied the reconsideration request.  (*Id.* ¶ 45.)

Thereafter, Plaintiffs concentrated their efforts on keeping S.C. healthy.  (SAC ¶ 49.)  They were allegedly told that "if S.C.'s needs were properly addressed by proper skilled nursing supervision, she would likely live at least 10 to 15 years and could live much longer."  (*Id.* ¶ 49.)

11cv2965

According to Plaintiffs, aspiration pneumonias were the greatest threat to S.C.'s health.  (*Id.* ¶ 50.)  S.C. also had many daily needs that Plaintiffs were allegedly unable to provide themselves.  (*Id.*)  As a result, Plaintiffs allege that they suffered from "great sleep deprivation."  (*Id.*)

On September 1, 2009, S.C. suffered her first documented aspiration pneumonia.  (SAC ¶ 51.)  She was treated with antibiotics at Camp Pendleton Naval Hospital and recovered.  (*Id.*)  But Plaintiffs allege that they were "specifically told that it was greatly important that they watch S.C.'s condition during the nights so that if any vomiting occurs, it [could] be cleaned up to prevent any possible pneumonia."  (*Id.*)

On February 8, 2010, S.C. experienced a second aspiration during the night which led to another pneumonia.  (SAC ¶ 52.)  During the same year, these episodes recurred on March 31, June 1, and June 17, and each time S.C. was treated at Camp Pendleton.  (*Id.*)  Plaintiffs allege that, with each passing episode, S.C. became weaker, more prone to pneumonia, and more resistant to antibiotics.  (*Id.* ¶ 53.)

On July 19, 2010, Dr. Matthew Piccone of Camp Pendleton Pediatrics submitted an electronic request for services to Defendant.  (SAC ¶ 54.)  The request was denied on the same day.  (*Id.*)  Plaintiffs allege they did not know what they needed to prove in order to have their request approved "because TriWest never adequately told them what further evidence was required."  (*Id.*)  On August 13, 2010, however, Plaintiffs submitted a request to Defendant for redetermination of the July 19, 2010 denial, which they supported with a letter from Dr. Piccone and "a new plan of care to reflect S.C.'s progressing needs."  (*Id.* ¶ 56.)  Once again, the request was denied.  (*Id.*)

On November 12, 2010, Dr. Mower, a neurologist, submitted a new request to Defendant, which included more "in depth" analysis of S.C.'s condition and a letter from Dr. Piccone.  (SAC ¶ 57.)  The request was denied two weeks later.  (*Id.* ¶ 58.)  On January 6, 2011, Plaintiffs submitted another request for reconsideration of the denial of Dr. Mower's November 12, 2010 request.  (*Id.* ¶ 59.)  Again, the request was denied.  (*Id.*)

Finally, Plaintiffs submitted a final appeal to the TMA in Colorado.  (SAC ¶ 60.)  That appeal remained undecided until it became moot by S.C.'s death.  (*Id.*)

11cv2965

1        S.C. suffered additional episodes of aspiration pneumonia on March 22 and July 16,

2 2011.  (SAC ¶ 62.)  On July 28, 2011, she suffered an aspiration burn and woke up to a 103-

3 degree fever.  (*Id.*)

4        On August 9, 2011, S.C. passed away.  (SAC ¶ 34.)

5        On December 20, 2011, Plaintiffs filed a complaint asserting six causes of action.

6 Thereafter, Defendant moved to dismiss for failure to state a claim under Federal Rule of Civil

7 Procedure 12(b)(6).  The Court granted Defendant's motion with leave to amend.

8        Thereafter, Plaintiffs filed their First Amended Complaint ("FAC") asserting the

9 following six causes of action: (1) wrongful death: tortious interference with contractual

10 relations, (2) wrongful death: negligence, (3) negligent infliction of emotional distress, (4)

11 intentional infliction of emotional distress, (5) survival action for tortious interference with

12 contractual relations, and (6) survival action for negligence.  Defendant then moved to dismiss

13 the FAC for failure to state a claim.  The Court granted in part and denied in part Defendant's

14 motion and granted Plaintiffs leave to amend their complaint.

15        On June 24, 2013, Plaintiffs filed their SAC asserting the same six causes of action as in

16 the FAC, but amended with respect to the first, fourth, fifth, and sixth causes of action.  (Doc.

17 28.)  Defendant now moves to dismiss the first, fourth, fifth, and sixth causes of action under

18 Rule 12(b)(6).  (Doc. 29.)  Plaintiffs oppose.  (Doc. 30.)

19

20 **II.  LEGAL STANDARD**

21        The court must dismiss a cause of action for failure to state a claim upon which relief can

22 be granted.  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the legal

23 sufficiency of the complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  The court

24 must accept all allegations of material fact as true and construe them in light most favorable to

25 the nonmoving party.  *Cedars-Sanai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d

26 972, 975 (9th Cir. 2007).  Material allegations, even if doubtful in fact, are assumed to be true.

27 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  However, the court need not "necessarily

28 assume the truth of legal conclusions merely because they are cast in the form of factual

11cv2965

1   allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003)

2   (internal quotation marks omitted).  In fact, the court does not need to accept any legal

3   conclusions as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

4         "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

5   factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

6   requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

7   of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted).  Instead, the

8   allegations in the complaint "must be enough to raise a right to relief above the speculative

9   level." *Id.*  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual

10  matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S.

11  at 678 (citing *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff

12  pleads factual content that allows the court to draw the reasonable inference that the defendant is

13  liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a 'probability

14  requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

15  *Id.*  A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory

16  or for insufficient facts under a cognizable theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749

17  F.2d 530, 534 (9th Cir. 1984).

18        Generally, courts may not consider material outside the complaint when ruling on a

19  motion to dismiss.  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19

20  (9th Cir. 1990).  However, documents specifically identified in the complaint whose authenticity

21  is not questioned by the parties may also be considered.  *Fecht v. Price Co.*, 70 F.3d 1078, 1080

22  n.1 (9th Cir. 1995) (superceded by statutes on other grounds).  Moreover, the court may consider

23  the full text of those documents, even when the complaint quotes only selected portions.  *Id.*  It

24  may also consider material properly subject to judicial notice without converting the motion into

25  one for summary judgment.  *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).

26  //

27  //

28  //

6

1  **III.    DISCUSSION**

2          **A.      Tortious Interference with Contractual Relations**

3          "The tort duty not to interfere with the contract falls only on strangers-interlopers who

4  have no legitimate interest in the scope or course of the contract's performance."  *Applied Equip.*

5  *Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994); *see also Mintz v. Blue Cross of*

6  *Cal.*, 172 Cal. App. 1594, 1603 (2009);  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d

7  1118, 1126 (1990) ("It has long been held that a stranger to a contract may be liable in tort for

8  intentionally interfering with the performance of the contract.").  "The elements which a plaintiff

9  must plead to state the cause of action for intentional interference with contractual relations are:

10  (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this

11  contract; (3) defendant's intentional acts designed to induce a breach or disruption of the

12  contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5)

13  resulting damage."  *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126.

14          Plaintiffs' first and fifth causes of action are based on a theory of tortious interference

15  with contractual relations.  Defendant argues that Plaintiffs fails to adequately allege facts that

16  satisfy the first element for an action for intentional interference with contractual relations

17  because Plaintiffs do not have a contractual relationship with TMA or TRICARE, but rather a

18  relationship established by federal law that expressly negates a contractual relationship.  (Def.'s

19  Mot. 12:17–19; Def.'s Reply 3:11–18.)  Plaintiffs respond that although TRICARE is governed

20  by federal statute, an implied-in-fact contract existed with which Defendant tortiously interfered.

21  (Pls.' Opp'n 8:5–10.)  The Court agrees with Defendant.

22          In California, the essential elements to the existence of a contract are: (1) parties capable

23  of contracting; (2) their consent; (3) a lawful object, and; (4) a sufficient cause or consideration.

24  Cal. Civ. Code § 1550.  "An implied contract is one, the existence and terms of which are

25  manifested by conduct."  Cal. Civ. Code § 1621.  "A contract implied in fact 'consists of

26  obligations arising from a mutual agreement and intent to promise where the agreement and

27  promise have not been expressed in words.'"  *Retired Emps. Ass'n of Orange Cnty., Inc. v. Cnty.*

28  *of Orange*, 52 Cal. 4th 1171, 1178 (2011) (quoting *Silva v. Providence Hosp. of Oakland*, 14

11cv2965

1   Cal. 2d 762, 773 (1939)).  "[T]he very heart of this kind of agreement is an *intent* to promise."

2   *Zenith Ins. Co. v. Cozen O'Connor*, 148 Cal. App. 4th 998, 1000 (2007) (quoting *Friedman v.*

3   *Friedman*, 20 Cal. App. 4th 876, 887 (1993)) (emphasis in original) (internal quotation marks

4   omitted).  "[I]t is presumed that a statutory scheme is not intended to create private contractual

5   or vested rights" and may only be recognized "if there is no legislative prohibition against such

6   arrangements."  *See Retired Emps. Ass'n of Orange Cnty.*, 52 Cal. 4th at 1776, 1186 (internal

7   quotation marks omitted).

8          According to Plaintiffs, there was an implied-in-fact contract between S.C. and

9   TRICARE to receive special care because of her special needs and enrollment in the Extended

10  Care Health Option ("ECHO") Program.  (Pls.' Opp'n 7:22–8:25.)  Defendant correctly argues

11  that there is no implied-in-fact contract between Plaintiffs and TMA or TRICARE because,

12  rather than consenting to a contractual relationship, the United States has expressly repudiated

13  such a relationship.  (Def.'s Reply 3:12-16.)  The TRICARE medical-benefits program,

14  governed by federal regulation, includes the following relevant language:

15         [TRICARE] is a program of medical benefits provided by the U.S.
        government under *public law* to specified categories of individuals who
16      are qualified for these benefits by virtue of their relationship to one of
        the seven Uniformed Services.  Although similar in structure in many
17      of its aspects, [TRICARE] is not an insurance program in that *it does
        not involve a contract* guaranteeing the indemnification of an insured
18      party against a specified loss in return for a premium paid.

19  32 C.F.R. § 199.1(d) (emphasis added).  Simply put, TRICARE does not provide medical

20  benefits to its participants through any contractual obligation.  *See id.*; *Retired Emps. Ass'n of*

21  *Orange Cnty.*, 52 Cal. 4th at 1776, 1186.

22         The TRICARE ECHO Program is merely an extension of the existing TRICARE

23  medical-benefits program described above, and it, too, is governed by public law.  *See* 32 C.F.R.

24  § 199.5.  Plaintiffs' argument that enrollment in the ECHO Program creates a contractual

25  relationship with TRICARE beneficiaries contradicts the express statutory language that

26  authorizes the entire TRICARE medical-benefits program.  *See* 32 C.F.R. § 199.1(d); 32 C.F.R.

27  § 199.5.  Federal law prohibits the existence of a private contract here—express or implied—for

28  TRICARE benefits, which in turn demonstrates that the United States has not consented to the

11cv2965

1  formation of a contractual relationship. *See* Cal. Civ. Code § 1550; 32 C.F.R. § 199.1(d); 32

2  C.F.R. § 199.5. Thus, the Court rejects Plaintiffs' contention that a contract existed between

3  themselves or S.C. and TMA or TRICARE in light of federal regulations that preclude the

4  existence of such a relationship. *See Iqbal*, 556 U.S. at 678.

5      Plaintiffs fail to adequately allege that a valid contract existed between themselves or S.C.

6  and a third party. *See Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126. Therefore, they cannot sustain

7  a cause of action for tortious interference with contractual relations. *See Retired Emps. Ass'n of*

8  *Orange Cnty.*, 52 Cal. 4th at 1776, 1186. Accordingly, the Court **DISMISSES WITH**

9  **PREJUDICE** Plaintiffs' first and fifth causes of action for the tortious interference with a

10  contractual relationship.[1]

11

12      **B.    Intentional Infliction of Emotional Distress ("IIED")**

13      There are three elements to state a prima facie case for IIED: "(1) extreme and outrageous

14  conduct by the defendant with the intention of causing, or reckless disregard of the probability of

15  causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3)

16  and actual and proximate causation of the emotional distress by the defendant's outrageous

17  conduct." *Cervantez v. J.C. Penney Co.*, 24 Cal. 3d 579, 593 (1979), *superseded by statute on*

18  *other grounds as stated in Melendez v. City of Los Angeles*, 63 Cal. App. 4th 1, 7 (1998). The

19  defendant's extreme and outrageous conduct must "exceed all bounds of that usually tolerated in

20  a civilized community." *McDaniel v. Gile*, 230 Cal. App. 3d 363, 372 (1991). "Behavior may

21  be considered outrageous if a defendant (1) abuses a relation or position which gives him power

22  to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental

23  distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to

24

25

26      [1] Defendant alternatively argues that even if a contract exists between Plaintiffs and TMA or TRICARE, the causes of action based on tortious interference with a contractual relationship are inadequate because Defendant is not a stranger to the alleged contract and is, therefore, precluded from liability. (Def.'s Mot. 13:5–19.) Because the Court dismisses this cause of action on independent grounds discussed above, it need not address the merits of Defendant's alternative argument.

27

28

9

1   result in illness through mental distress." *Pulver v. Avco Fin. Servs.*, 182 Cal. App. 3d 622, 637

2   (1986).  Mere denial or delay of insurance benefits does not constitute outrageous conduct

3   sufficient to support an IIED claim.  *Mintz*, 172 Cal. App. 4th at 1608; *Hailey v. Cal.*

4   *Physicians' Serv.*, 158 Cal. App. 4th 452, 474 (2007); *see also Ricard v. Pac. Indem. Co.*, 132

5   Cal. App. 3d 886, 890, 895 (1982) (finding no error where trial court determined an insurer that

6   allegedly improperly investigated, processed, and communicated a claim and delayed payments

7   was not outrageous conduct).

8        For Plaintiffs' fourth cause of action for IIED, the parties dispute whether Plaintiffs

9   adequately plead extreme and outrageous conduct.  The parties agree that the denial of insurance

10  benefits alone is insufficient to support an action for IIED.  (Def.'s Mot. 16:4–22; Pls.' Opp'n

11  14:12–14.)  Instead, Plaintiffs argue that "Defendant's knowledge as to the special needs and

12  vulnerabilities of the Plaintiff in making its denial decision[] can form the basis of an IIED

13  claim." (Pls.' Opp'n 14:12–14.)  They discuss several cases that purportedly supports their

14  argument, including *Hailey*, *Hernandez v. General Adjustment Bureau*, 199 Cal. App. 3d 999

15  (1988), *Fletcher v. Western National Life Insurance Co.*, 10 Cal. App. 3d 376 (1970), and

16  others.

17       In *Hailey*, the court noted that "a plan acts in an outrageous manner if it obtains

18  information entitling it to rescind, yet deliberately forgoes rescission until after the subscriber

19  has suffered a serious illness or injury.  By adopting a 'wait and see' attitude, a plan not only

20  risks bad faith liability, but liability for intentional infliction of emotional distress if the plan

21  knows the subscriber 'is peculiarly susceptible to emotional distress, by reason of some physical

22  or mental condition or peculiarity.'" 158 Cal. App. 4th at 476.  Knowledge of the right to

23  rescind coverage, but sitting on that right in order to siphon money from a subscriber that the

24  plan had no intention to cover, is the primary culprit for the extreme and outrageous conduct.

25  *See id.*  This is not merely conscious disregard.  *See id.*  It is malicious conduct, which the *Hailey*

26  court felt "risk[ed] bad faith liability." *See id.*  Plaintiffs fail to identify any conduct that "risks

27  bad faith liability." *See id.*  Thus, *Hailey* does not apply here in the manner that Plaintiffs'

28  suggest.

11cv2965

In *Hernandez*, there was "no question that appellant was entitled to workers' compensation benefits."  199 Cal. App. 3d at 1002.  "Nonetheless, appellant's approved disability payments were consistently late."  *Id.*  *Hernandez* is distinguishable from this case for, at least, two reasons.  First, S.C.'s entitlement to 24-hour care was in dispute; though Plaintiffs feel she was entitled to that care, Defendant clearly concluded otherwise.  *See id.*  And second, the repeated conduct here is not repeatedly withholding something that Plaintiffs are already entitled to, but rather having a claim denied at multiple review levels.  *See id.*  Those multiple levels of review merely led to repeated claims rejections.

And in *Fletcher*, outrageous conduct was not even at issue because the defendants "conced[ed] that their conduct was outrageous and that the evidence is sufficient to support the jury's implied finding of the requisite intent or reckless."  10 Cal. App. 3d at 394.  Rather, the defendants argued that their conduct was privileged, an argument that the court ultimately rejected.  *Id.* at 396.  Consequently, *Fletcher* provides little to no guidance as to whether Defendant's conduct in this case was indeed extreme and outrageous.  *See id.* at 394.

Defendant assessed Plaintiffs' claim, and after multiple levels of review, ultimately rejected that claim.  This is tantamount to denying a claim for benefits, which does not qualify as extreme and outrageous conduct, and nothing more.  *See Mintz*, 172 Cal. App. 4th at 1608; *Hailey*, 158 Cal. App. 4th at 474.  Plaintiffs charge Defendant with "conscious disregard," but exhibits attached to the SAC show that physician reviewers had evaluated their claim.  (*See* SAC Exs. B, C, D, & F.)  Plaintiffs fail to show that Defendant's conduct is something more than merely denying a benefits claim, and thus fail to plead facts to raise their IIED cause of action beyond a speculative level.  *See Twombly*, 550 U.S. at 555.  Accordingly, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' fourth cause of action for intentional infliction of emotional distress.

//

//

//

//

11cv2965

### C.   Survival Causes of Action and Recoverable Damages

Damages recoverable for survivor actions are addressed by California Code of Civil

Procedure § 377.34:

> In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement.

Survivors may not recover for pain, suffering, or disfigurement because "[t]he Legislature

considered such injuries strictly personal to the decedent and therefore not transmissible to the

estate." *Cnty. of Los Angeles v. Superior Court of Los Angeles Cnty.*, 21 Cal. 4th 292, 307

(1999).

Plaintiffs' fifth and sixth causes of action are statutory survival actions.  They seek

damages for "the deterioration of [S.C.'s] health," the "reduc[tion of] her chances of coping with

her medical condition," the "reduction in her chances to live a productive life," and "the

reduction of her chances to be gainfully employed." (SAC  ¶¶ 144–48, 166–70.)  The allegations

related to damages for both survival causes of action are, in relevant part, identical.  (*See id.*)

Consequently, the Court will address the sufficiency of these survival actions together.

Defendant argues that Plaintiffs' survival causes of action both fail because Plaintiffs

allege only non-economic damages that are not statutorily recoverable.  (Def.'s Mot. 19:12–15.)

In response, Plaintiffs contend that they seek two types of damages: (1) personal-injury damages

that S.C. suffered "in the form of deterioration of her health," and (2) damages "based on S.C.'s

diminished life expectancy which had a direct impact on S.C.'s future earning capacity."  (Pls.'

Opp'n 19:8–20:9.)

Plaintiffs cannot recover damages for the deterioration of S.C.'s health because that is a

request for pain-and-suffering damages that did not transfer to Plaintiffs. *See Cnty. of Los*

*Angeles*, 21 Cal. 4th at 307.  California law unequivocally prohibits these types of recovery that

Plaintiffs seek as survivors. *See id.*; *see also* Cal. Civ. P. Code § 377.34.  Moreover, Plaintiffs

do not provide the Court with any authority that shows that they may pursue damages for "future

11cv2965

1   earning capacity" as survivors.  They cite *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573

2   (1974), and *Fein v. Permanente Medical Group*, 38 Cal. 3d 137 (1985), but both are

3   distringuishable.  The former involves federal admiralty law, and the latter is a medical-

4   malpractice case that does not discuss survivors' rights.  *See Sea-Land Servs.*, 414 U.S. at 612;

5   *Fein*, 38 Cal. 3d at 175-76 (Bird, C.J., dissenting).  And neither case discussed California's

6   survival statute.  *See id.*

7        Plaintiffs do not seek any damages recoverable under California's survival statute, such

8   as medical expenses or any other pecuniary loss incurred before death.  Rather, they only seek

9   non-recoverable damages.  *See Cnty. of Los Angeles*, 21 Cal. 4th at 304.  Because Plaintiffs fail

10  to plead recoverable damages in accordance with California's survival statute, the Court

11  **DISMISSES WITH PREJUDICE** Plaintiffs' fifth and sixth survival causes of action.

12

13  **IV.   CONCLUSION & ORDER**

14        In light of the foregoing, the Court **GRANTS WITHOUT LEAVE TO AMEND**

15  Defendant's motion to dismiss.  (Doc. 29.)  Because Plaintiffs fail to sufficiently assert the

16  following causes of action after multiple opportunities to amend their complaint, the Court

17  **DISMISSES WITH PREJUDICE** Plaintiffs' first, fourth, fifth, and sixth causes of action.  *See*

18  *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) ("[A] district

19  court may dismiss without leave where . . . amendment would be futile.").

20        **IT IS SO ORDERED.**

21

22  DATED: October 21, 2013

23

24                                              M. James Lorenz
                                                United States District Court Judge

25  COPY TO:

26  HON. RUBEN B. BROOKS
    UNITED STATES MAGISTRATE JUDGE
27
    ALL PARTIES/COUNSEL
28

11cv2965